April 3, 2018

**VIA ECF Filed Under Seal**

The Honorable William H. Orrick
United States District Judge
Northern District of California
450 Golden Gate Avenue, Courtroom 2, 17th Floor
San Francisco, CA 94102

Re: *Apple Inc. v. Mobile Star LLC*, Case No. 3:16-cv-6001 WHO
Joint Statement Re: Apple's Motion For Protective Order

Dear Judge Orrick:

**<u>Apple's Statement:</u>**

Mobile Star ("MS") and DGL (collectively "Defendants") seek incredibly broad and highly irrelevant discovery relating to Apple's manufacturing processes. *Apple's* manufacturing processes have no bearing on *Defendants'* products because Defendants' own testimony and documents establish that their counterfeits did not originate from an Apple-authorized facility. [1] Not only is this contention belied by the facts, it is contradicted by Defendants' previous statements to this Court that their source was a "secondary retail market for genuine goods." In order to address this contradiction, MS now grossly mischaracterizes the record, including the testimony of an Apple witness, and manufactures a theory about its inventory that is directly contradicted by its own CEO. The evidence makes clear that Defendants' products are not sourced from an Apple authorized manufacturer. Onerous discovery into Apple's processes has no relevance to this case and will distract from the actual disputed issues. This is a quintessential fishing expedition. Defendants are not entitled to this discovery; Apple should be granted a protective order. *See* Fed. R. Civ. P. 26(c).

Apple challenges discovery seeking 1) detailed information relating to products (MS Interrogatory Nos. 17, 18; MS RFP Nos. 25, 27; MS 30(b)(6) Depo. Topics 28-30; DGL Interrogatory No. 17; DGL RFP No. 16) and 2) detailed information relating to alleged failures of the quality control processes used by Apple authorized facilities (MS RFP Nos. 28-29; MS 30(b)(6) Depo. Topics 31-32; DGL Interrogatory Nos. 18; DGL RFP Nos. 10, 11, 12, 14, 15).[2] Apple seeks a protective order precluding Defendants from pursuing these open-ended lines of discovery, either through the enumerated discovery requests or during depositions of Apple fact witnesses (collectively "the Challenged Discovery"). While Apple has agreed to meet and confer on other discovery requests seeking general information relating to quality control and , the level of detail in the Challenged Discovery is irrelevant and overly burdensome.

***The Challenged Discovery is Not Relevant to the Facts of the Case.***

Defendants seek evidence about the details of Apple's authorized factories, where there is no allegation that Defendants procured their inventory from such factories. The discovery should be denied for four reasons: 1) Defendants have never alleged that they procured their products from an Apple-authorized factory, and in fact told the Court the opposite; 2) discovery shows that Defendants did not directly or indirectly procure their products from an Apple-authorized facility; 3) *even if* the products were made by Apple's manufacturers and stolen or diverted without Apple approval, courts throughout the country, including the Ninth Circuit, recognize that such products would still be counterfeit, and thus would not impact Defendants' liability; and 4) the information Defendants seek is enormously voluminous and therefore burdensome to produce, and contains some of Apple's most closely held and competitively-sensitive information. Defendants have not established "that such disclosure is relevant *and* necessary to the proper presentation of" their case. *Hartley Pen Co. v. U.S. Dist. Court*, 287 F.2d 324, 331 (9th Cir. 1961) (emphasis added).

<u>Defendants' Counterfeit Products Did Not Originate From Authorized Facilities.</u> Since the beginning of this case, MS has contended that its inventory consisted of genuine Apple products

---

1

2 Defendants' claim that Apple did not respond to Interrogatory 16 is wrong. Apple responded in substance, directed Mobile Star to serial number validation materials available for inspection since July 2017 pursuant to Court Order (ECF 125), and offered to meet and confer if Mobile Star needs more discovery. But Mobile Star has never even requested to inspect those materials, which it claimed were "critically relevant" to its defense, ECF 92-4, so it has no idea if further discovery is even necessary. And Mobile Star has not sought a meet and confer, so any motion is premature.

that had been sourced from the "secondary market" from "original points of supply through mobile carriers and licensed retailers." *See, e.g.*, ECF No. 33 ¶¶ 5, 7. MS has never contended that its inventory was diverted from an Apple authorized facility. The Challenged Discovery is only possibly relevant *if* MS admits that its prior statements were false. While discovery *has* shown that MS's previous statements were incorrect, it is now clear that MS gets most of its Apple-branded products through a web of companies that import fake Apple products from unlicensed manufacturers in China. And DGL sourced nearly all of its Apple-inventory from two such companies who import from a single Chinese counterfeiter.

In response, Defendants rely on speculation and inaccurate and inconsistent cites to the record.[3] The claim [REDACTED] is a red herring. There is no evidence (or plausible theory) that their suppliers could obtain products from an Apple facility. Now, contrary to its past statements that its inventory was from the secondary market, MS claims that its inventory came in Foxlink boxes. But this new contention is directly contradicted by MS's own CEO, who claims to inspect most "Apple" shipments, and who testified he does not "recall seeing a box that had Foxlink's name on it." Regardless, no evidence suggests that products in boxes labeled "Foxlink" contain genuine Apple products; Defendants should not be granted a fishing expedition based on speculation.

Additionally, the products themselves provide clear evidence that they did not originate from Apple-authorized factories. The physical characteristics, such as the interior design of the products, differ from genuine products in ways that foreclose the possibility [REDACTED] They are made using different designs than genuine products, ECF No. 16 ¶ 7, and/or use materials that are not used in genuine Apple products, [REDACTED] ECF Nos. 53-6–21. Side-by-side comparisons of x-rays of MS's products in this case to genuine products show that the design of MS's counterfeits is manifestly different from that of genuine Apple products. *See, e.g.*, ECF No. 16 ¶ 8. Similarly, some of the products have obvious typos in the product artwork such as misspelling "technology" as "technqlogy." ECF No. 53–6. Further, the serial numbers applied to Defendants' products do not correspond with products authorized by Apple [REDACTED] *See, e.g.*, ECF No. 55-7 ¶ 5.[4] Of course, the serial number check is just a single test for counterfeits. Just because Apple determines that a product is counterfeit because it has an invalid serial number does not mean that other indicators do not exist; to the contrary, other indicators often do exist. There is no plausible claim that these products originated in Apple's factories; Defendants' fishing expedition should be rejected.

[REDACTED] the law is clear that it would still be counterfeit. The touchstone of genuineness is the mark holder's opportunity to apply quality control standards to products bearing its mark before authorizing for sale. *Idaho Potato Com'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721–22 (9th Cir. 2005). If the products imported from China and sold by Defendants were produced by Apple-authorized manufacturers, they are still counterfeit because they neither passed Apple's quality control nor been approved by Apple for sale. *See Hunting World Inc. v. Reboans Inc.*, No. 92–1519 BAC, 1992 WL 361741, at *3 (N.D. Cal. Sept. 10, 1992) (holding that goods obtained from mark holder's factory are counterfeit if "subverted" and never "inspected by the trademark owner to insure quality"); *see also Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 620 (9th Cir. 1993) (holding that

---

[3] If the Court is inclined to give any credence to Defendants' unsupported speculation, Apple respectfully requests that the Court permit full briefing on this issue so that the Court may have a full record in front of it.

[4] [REDACTED] is explained in the serial number discovery that was subject to a prior motion. ECF 125. While Defendants now seek *additional* discovery into Apple's serial numbers, they have not inspected what was already made available.

chips made by Intel but later marked by defendant with the incorrect speed were "counterfeit").[5]

The Challenged Discovery is Irrelevant, Onerous, and Highly Sensitive. The volume of information sought by the Challenged Discovery is burdensome. For example, MS's RFP No. 25 seeks "All documents, including communications, that refer, relate, or pertain to" [REDACTED]. Apple has dozens of manufacturing partners which make over a billion of products a year. Collecting and reviewing all documents that might have a connection to the possibility of [REDACTED], including all policies, guidelines, and communications would be an arduous task, not proportional to the needs of the case. The remaining Challenged Discovery seeks detailed information about the inner workings of Apple's manufacturing processes and is similarly onerous.

In light of the foregoing, Defendants will not be able to establish that the discovery they seek is "relevant and necessary" to their defense. *Hartley Pen*, 287 F.2d at 331. The clear lack of relevance, compounded with the incredibly sensitive nature of the Challenged Discovery warrants a protective order in this case. Information relating to [REDACTED] and details regarding alleged failures of quality control systems are trade secret information because, *inter alia*, keeping that information out of the public domain helps prevent the proliferation of unauthorized goods. This Court already recognized the sensitivity of this type of information. *See* ECF 125.

Accordingly, Apple requests that the Court issue the requested protective order.

**Mobile Star & DGL Group's Statement:**

Apple seriously misrepresents the narrow discovery that Defendants seek and its central relevance to the litigation. Defendants have requested information regarding [REDACTED][6] [REDACTED] Now, Apple tries to invert the evidentiary burden by demanding that Defendants prove the products in this case [REDACTED] before allowing relevant discovery.

Apple alleges willful trademark infringement on the theory that Defendants sold counterfeit Apple-branded products, which they should have known were counterfeit. What Apple fails to disclose, however, is that its own investigation concluded that **75%** of the products sampled in this action were "counterfeit" based [REDACTED] This Apple evidence shed new light on previous testimony from Mobile Star's Receiving Manager that approximately **75%** of Mobile Star's Apple-branded inventory arrived at Mobile Star packaged in boxes bearing the name of an Apple authorized factory. Putting these two evidence threads together leads to the unmistakable inference that [REDACTED]

[5] Contrary to Defendants' suggestion, Apple is not challenging all discovery into its quality control process—it has agreed to meet and confer with Defendants to discuss the scope of non-Challenged Discovery.

[6] Defendants also requested information about how and when serial numbers are applied to the products, in order to determine [REDACTED]. Apple has not moved for a protective order on that request, but has refused to respond all the same, citing the unrelated issue of Defendants' inspection of Apple's serial number verification *software*, which has no information about how serial numbers are physically applied to products. For judicial efficiency, Defendants request by this letter that Apple be compelled to respond to Interrogatory No. 16 and describe "the process by which serial numbers are applied to and/or imprinted" on Apple-branded products. The parties met and conferred about this exact issue on February 28, 2018.



[redacted] Indeed, it seems the "counterfeit" problem described in Apple's complaint—where Apple claims that 70–80% of **all** Apple products on the market are counterfeit—[redacted].

Further discovery establishing how and when serial numbers are applied to products at Apple's factories, [redacted], [redacted] is integral to confirming that the vast majority of products in this case were [redacted]. And if Defendants unwittingly sold Apple products that looked like genuine Apple product [redacted], then they cannot have *willfully* sold counterfeit products. Similarly, information regarding Apple's QC standards is critical to both liability and any claim of willfulness. If products bearing what Apple claims are indicia of non-genuineness (*e.g.*, poor quality print or typos) slip through Apple's own QC, then such products would not be counterfeit after all, and Defendants certainly could not be faulted for failing to catch products that eluded even Apple.

Apple has not carried its burden to establish good cause for this protective order. It refused to consider or discuss narrowing the requests or agreeing on search terms, and so its unsubstantiated claim that the volume of material sought is "burdensome" rings hollow. Finally, any concerns about Apple's trade secrets (which, again, Apple does not substantiate) are more than satisfied by this litigation's robust stipulated protective order, which includes "Attorney's Eyes Only" protections.

***The Discovery Sought Is Central to Core Issues of Liability & Willfulness***

<u>The Products In This Case Likely Originated From Apple's Authorized Factories</u>. While it is true that Defendants purchased Apple-branded products from resellers on the secondary market who represented that the products were sourced through "reverse logistics" channels (*e.g.*, returns or excess inventory), [redacted]

Such an inference is independently corroborated by Mobile Star's Receiving Manager, Ernest Latchman, who testified that roughly 75% of Mobile Star's acquisitions came in boxes from Apple's authorized factories, including Foxlink. Latchman Dep. Tr. This evidence has the potential to affect the entire dynamic of this case, but without additional discovery confirming exactly [redacted]

As to that small minority of products Apple tested that exhibited visual flaws that might be apparent to a consumer, Defendants seek evidence that those flaws exist even in genuine Apple products that pass through Apple's QC. Apple argues that printing typos, *e.g.*, would never slip through their QC, and are thus proof that a product is counterfeit. But Apple refuses to allow any discovery to test that claim. If, as Defendants believe, a genuine Apple product can exhibit a typo and still enter the market, then Apple's supposed proof of counterfeiting collapses.

[redacted] <u>Question Goes to Core Issues of Willfulness.</u> Apple alleges that Defendants are willful infringers because they should have known that the products at issue were counterfeit. By contrast, Defendants have shown that their employees regularly inspected shipments of Apple-

branded products to look for visual indicators of counterfeiting, and never sold any products that appeared counterfeit. Apple has called such assertions "baseless." ECF No. 55 at p. 5. But now, the evidence shows that, for the vast majority of products tested in this case, the [redacted] That information would never have been available to the public, because Apple treats its [redacted] as extremely sensitive, and will not disclose it outside the company. David Dep. Tr. If Defendants can show that products with [redacted] Such evidence will go a long way toward corroborating Defendants' evidence that they inspected the shipments of products and that, by all visual inspection techniques known to the public, the products appeared genuine.

[redacted] That Passed Through Apple's QC Procedures Are Not Counterfeit. Apple claims that [redacted] question is irrelevant to liability, because those products could not have passed Apple's QC procedures and therefore would have been counterfeit anyway. But that begs the question, and is asserted without evidence. Defendants are entitled to know whether the types of products at issue here—*i.e.*, products that look genuine, [redacted]—are produced in Apple's factories and can pass through Apple's QC. [redacted] Such products would not be counterfeit at all, and Defendants would have no liability. *See Hunting World Inc. v. Reboans Inc.*, 1992 WL 361741, at *3 (N.D. Cal. Sept. 10, 1992) (finding products counterfeit only after discovery of plaintiff's QC procedures showed that the products at issue "were not subjected to [plaintiff's] quality control procedures"). Here, Apple has relied on assertions that its QC procedures catch all nonconforming products; it cannot simultaneously refuse to produce evidence to test that assertion.

***Apple Misstates the Discovery Sought and Fails to Carry Its Burden***

Apple claims that the discovery sought is burdensome, but directly misstates the requests at issue and has refused to even entertain a discussion of search terms or other compromises on the scope. Apple claims that Mobile Star's RFP No. 25 seeks "All documents . . . that refer, relate or pertain to" [redacted]. But that is false. The request seeks all documents relating to [redacted] That is significantly more narrow, and goes to the core issue of [redacted]. What Defendants seek is simple. Defendants need to know exactly what [redacted]

Apple complains about the overbreadth of the document requests, but offers no evidence of the actual volume of documents at issue. Apple will not meet and confer about how it could go about performing this search, and whether the parties might need to narrow the document requests. But even if there were some massive volume of responsive documents, that still would not explain why Apple could not produce a witness capable of testifying on the noticed topics, or answer Defendants interrogatories. The issue of document overbreadth is simply a red-herring.

Apple then asserts that the discovery sought are trade secrets that Apple cannot possibly produce in litigation. First, Apple has not made any *prima facie* showing that the material at issue is a trade secret. Even assuming it is, the robust Stipulated Protective Order (ECF No. 50) entered in this case, including its "Attorney's Eyes Only" protections, provide more than adequate protections. Defendants would welcome an in-person hearing to discuss these issues if the Court is so willing.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Thomas Zellerbach*

Thomas H. Zellerbach
*Attorneys for Plaintiff*

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP

*/s/ Joshua Geller*

Joshua Geller
*Attorneys for Defendant Mobile Star*

BRAUNHAGEY & BORDEN LLP

*/s/ Andrew Levine*

Andrew Levine
*Attorneys for Defendant DGL*

ATTESTATION OF CONCURRENCE

I, Thomas H. Zellerbach, as the ECF user and filer of this document, attest that concurrence in the filing of this document has been obtained from each of the above signatories.

Dated: April 3, 2018

*/s/ Thomas Zellerbach*
Thomas H. Zellerbach